UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

GWENDOLYN McGOWIN,                    )      NO. EDCV 09-1203-CT
                                      )
          Plaintiff,                  )      OPINION AND ORDER
                                      )
     v.                               )
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of                       )
Social Security,                      )
                                      )
                                      )
          Defendant.                  )
_____       )

     For the reasons set forth below, it is ordered that judgment be
entered in favor of defendant Commissioner of Social Security ("the
Commissioner") because the Commissioner's decision is supported by
substantial evidence and is free from material legal error.

<u>SUMMARY OF PROCEEDINGS</u>

     On July 2, 2009, plaintiff, Gwendolyn McGowin ("plaintiff"), filed
a complaint seeking judicial review of the denial of benefits by the
Commissioner pursuant to the Social Security Act ("the Act").  The
parties consented to proceed before the magistrate judge. On October 15,
2009, plaintiff filed a brief with points and authorities in support of
remand or reversal.  On November 16, 2009, the Commissioner filed

1   defendant's memorandum in favor of cross-motion for summary judgment and

2   in opposition to plaintiff's motion for summary judgment.

3                    SUMMARY OF ADMINISTRATIVE RECORD

4       1.   Proceedings

5       On   February   6,   2007,   plaintiff   filed   a   applications   for

6   Supplemental Security Income ("SSI"), and disability and disability

7   insurance benefits, alleging disability since August 1, 2005, due to

8   depression, heart disease with chronic chest pain, anxiety, lower back

9   problems, high blood pressure, and high cholesterol.  (TR 23-25, 55-58,

10  131.)[1]  The applications were denied initially and upon reconsideration.

11  (TR 59-63, 69-71.)

12      On August 2, 2007, plaintiff filed a request for a hearing before

13  an administrative law judge ("ALJ").  (TR 80.)  On September 25, 2008,

14  plaintiff, represented by an attorney, appeared and testified before an

15  ALJ.[2]  (TR 28-52.)  The ALJ also considered vocational expert ("VE")

16  testimony.  (TR 52-54.)

17      On November 19, 208, the ALJ issued a decision finding that, while

18  plaintiff suffers from an unfortunate combination of severe impairments,

19  she was not disabled or eligible for benefits under the Act because she

20  remains able to do a limited range of light work, leaving her able to

21  perform her past relevant work as a reservations clerk.  (TR 11-22.)  On

22  January 13, 2009, plaintiff filed a request with the Social Security

23  Appeals Council to review the ALJ's decision.  (TR 4.)  On May 19, 2009,

24

25      [1]   "TR" refers to the transcript of the record of
    administrative proceedings in this case and will be followed by
26  the relevant page number(s) of the transcript.

27      [2]  At the hearing, plaintiff amended her alleged onset date
    to July 6, 2005.  (See TR 11, 31-32.)

28

1 the request was denied. (TR 1-3.) Accordingly, the ALJ's decision
2 stands as the final decision of the Commissioner.
3     Plaintiff subsequently sought judicial review in this court.
4          2.   Summary Of The Evidence
5     The ALJ's decision is attached as an exhibit to this opinion and
6 order and materially summarizes the evidence in the case.

### PLAINTIFF'S CONTENTIONS

8     Plaintiff essentially contends the ALJ failed to:
9 1.   Properly consider the physical and mental demands of plaintiff's
10      past relevant work;
11 2.   Pose a complete hypothetical question to the vocational expert;
12      and,
13 3.   Make proper credibility findings regarding plaintiff's subjective
14      symptoms.

### STANDARD OF REVIEW

16     Under 42 U.S.C. §405(g), this court reviews the Commissioner's
17 decision to determine if: (1) the Commissioner's findings are supported
18 by substantial evidence; and, (2) the Commissioner used proper legal
19 standards. Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996).
20 Substantial evidence means "more than a mere scintilla," Richardson v.
21 Perales, 402 U.S. 389, 401 (1971), but less than a preponderance.
22 Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997).
23     When the evidence can reasonably support either affirming or
24 reversing the Commissioner's conclusion, however, the Court may not
25 substitute its judgment for that of the Commissioner. Flaten v.
26 Secretary of Health and Human Services, 44 F.3d 1453, 1457 (9th Cir.
27 1995).   The court has the authority to affirm, modify, or reverse the
28

3

1 Commissioner's decision "with or without remanding the cause for
2 rehearing."  42 U.S.C. §405(g).

3 <u>DISCUSSION</u>

4    1.  <u>The Sequential Evaluation</u>

5    A person is "disabled" for the purpose of receiving social security
6 benefits if he or she is unable to "engage in any substantial gainful
7 activity by reason of any medically determinable physical or mental
8 impairment which can be expected to result in death or which has lasted
9 or can be expected to last for a continuous period of not less than 12
10 months."  42 U.S.C. §423(d)(1)(A).

11    The Commissioner has established a five-step sequential evaluation
12 for determining whether a person is disabled.  First, it is determined
13 whether the person is engaged in "substantial gainful activity."  If so,
14 benefits are denied.

15    Second, if the person is not so engaged, it is determined whether
16 the person has a medically severe impairment or combination of
17 impairments.  If the person does not have a severe impairment or
18 combination of impairments, benefits are denied.

19    Third, if the person has a severe impairment, it is determined
20 whether the impairment meets or equals one of a number of "listed
21 impairments." If the impairment meets or equals a "listed impairment,"
22 the person is conclusively presumed to be disabled.

23    Fourth, if the impairment does not meet or equal a "listed
24 impairment," it is determined whether the impairment prevents the person
25 from performing past relevant work.  If the person can perform past
26 relevant work, benefits are denied.

27    Fifth, if the person cannot perform past relevant work, the burden
28

1  shifts to the Commissioner to show that the person is able to perform
2  other kinds of work.   The person is entitled to benefits only if the
3  person is unable to perform other work.  20 C.F.R. §§404.1520, 416.920;
4  Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).
5      2.   Issues
6          A.   Past Relevant Work and VE Hypothetical (Issue # 1 and
7               Issue # 2)
8      Plaintiff contends the ALJ erred in concluding she can perform her
9  past relevant work because he did not make findings of fact regarding:
10 (1) the mental and physical demands of the job as she actually performed
11 it and (2) whether someone with plaintiff's level of mental functioning
12 could perform the job. These contentions are belied by the record.
13     At step four, plaintiff has the burden of showing that she can no
14 longer perform her past relevant work.   Pinto v. Massanari, 249 F.3d
15 840, 844 (9th Cir. 2001).   Nonetheless, the ALJ had the duty "to make
16 the requisite factual findings to support [any] conclusion." Id.  This
17 duty required the ALJ to examine plaintiff's "'residual functional
18 capacity and the physical and mental demands' of [plaintiff's] past
19 relevant work." Id. at 844-45 (quoting 20 C.F.R. §§ 404.1520(e),
20 416.920(e)).  Plaintiff must be able to perform her past relevant work
21 either as actually performed or as generally performed in the national
22 economy.  Id. at 845 ("[w]e have never required explicit findings at
23 step four regarding a claimant's past relevant work both as generally
24 performed and as actually performed") (emphasis in original).
25     Consequently, in assessing plaintiff's capacity to perform her past
26 relevant work, the ALJ will make findings of fact as to:
27 (1) her RFC;
28
                                  5

1   (2) the mental and physical demands of the past job; and,

2   (3) whether plaintiff's RFC would permit a return to that past job.

3   See Social Security Ruling 82-62. See also Terry v. Sullivan, 903 F.2d

4   1273, 1275 (9th Cir. 1990) (federal statutes, administrative regulations

5   and Social Security Rulings form a comprehensive scheme of legal

6   standards that ALJs must follow in determining whether plaintiff is

7   entitled to disability benefits).

8        The ALJ made legally sufficient findings of fact in each of these

9   areas here.

10       First, he concluded that, while plaintiff is limited in various

11  areas of her functioning, she nonetheless retains the RFC to perform a

12  limited range of "light" level work as follows:

13           [Plaintiff] has the residual functional capacity to perform
             light work as defined in 20 CFR 404.1567(b) and 416.967(b)
14           except she is limited to sitting one hour at a time, five or
             six hours in an eight hour workday.  She can stand three hours
15           in an eight-hour workday for 30 minutes at a time and should
             be allowed to reposition each hour for one to three minutes.
16           The claimant should be allowed to lie down during her lunch
             break.   The [plaintiff] can occasionally climb stairs or
17           ramps, balance, stoop, kneel, crouch, and crawl and she is
             precluded from climbing ropes, ladders or scaffolds.   The
18           [plaintiff] is able to perform moderately complex tasks.

19  (TR 15.) The RFC is based upon substantial evidence of record.  Indeed,

20  because the ALJ found plaintiff to be credible in large part and in

21  order to account for those of plaintiff's subjective complaints the ALJ

22  found to be credible, the ALJ found plaintiff to be even more limited

23  than was opined by the consultative examining physician and

24  psychiatrist, and the reviewing physicians, whose reports the ALJ

25  otherwise chose to adopt as well-reasoned and well-supported.  (See TR

26  18-20, 226-21, 224-30, 243-50, 312-15.)

27       Second, the ALJ made specific findings based upon the report of

28
                                        6

vocational expert Stephen Berry regarding the mental and physical demands of plaintiff's relevant work, i.e., that the job was at the "sedentary" physical level and required the mental capacity for "skilled, SVP:5" work. (TR 192.) This is legally sufficient. See Lewis v. Barnhart, 281 F.3d 1081, 1083 (9th Cir. 2002) (citation omitted) ("The Social Security Regulations provide that the ALJ may draw on two sources of information to define [plaintiff's] past relevant work as actually performed: (1) [plaintiff's] own testimony, and (2) a properly completed vocational report.").

Third, based upon the testimony of the VE at the administrative hearing, the ALJ found that plaintiff could perform her past relevant work both as it was actually and generally performed in the economy. (TR 21, 52-54.) To the extent plaintiff contends the VE's testimony does not constitute substantial evidence because the ALJ omitted the limitation to tasks of "moderate complexity" from the VE hypothetical, the court disagrees. To the contrary, the ALJ specifically asked the VE to opine whether a hypothetical person with "a tenth-grade education" could perform plaintiff's past relevant work. (TR 52-53.) This limitation effectively encompasses the found limitation to tasks of moderate complexity.

There is no material legal error here.

B.   Plaintiff's Credibility

Next, plaintiff contends the ALJ failed to provide legally sufficient reasons for rejecting her testimony because he discounted her credibility based solely on a lack of support in the medical evidence. This contention, too, is belied by the record.

First, as was touched on above, the ALJ found plaintiff to be

sympathetic and largely credible and, consequently, credited plaintiff's subjective statements to a large extent in narrowing the RFC opined by the consultative examining physician and  psychiatrist, and the state agency reviewing physicians.  (See TR 19, 226-21, 224-30, 243-50, 312-15.)  To the extent the ALJ declined to credit plaintiff's subjective statements in their entirety, however, he offered legally sufficient reasons for so doing.

In conducting an evaluation of plaintiff's credibility, the ALJ must make findings that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit [plaintiff's] testimony." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted).  Absent affirmative evidence of malingering, an adverse credibility finding must be based on "clear and convincing reasons." Carmickle v. Comm'r of Social Sec. Admin., 533 F.3d 1155, 1160 (9th Cir. 2008).  Although the ALJ's interpretation of plaintiff's testimony may not be the only reasonable one, if it is supported by substantial evidence "it is not [the court's] role to second-guess it." Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citation omitted).

In assessing a plaintiff's credibility, the ALJ may use "ordinary techniques" of credibility evaluation. Tonapetyan v. Halter, 242 F.3d 11244, 1147-48 (9th Cir. 2001).  Accordingly, inconsistencies in a plaintiff's testimony, or inconsistencies between a plaintiff's testimony and other evidence of record, including the medical evidence and plaintiff's daily activities, may weigh into the evaluation. Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991); See also Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. §

8

1  404.1529(c)(2)) (a conflict with the medical evidence is "a relevant

2  factor"). Once plaintiff produces objective medical evidence of an

3  underlying impairment, however, the Commissioner may not reject

4  plaintiff's subjective complaints solely because the medical evidence

5  does not fully corroborate the alleged severity of her complaints.

6  Bunnell v. Sullivan, 947 F.2d at 345.

7      Furthermore, vague testimony may also render a plaintiff's

8  testimony less credible, Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th

9  Cir. 2008), as may evidence of conservative medical treatment, Parra v.

10  Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007)(citation omitted). See

11  also Tommasetti v. Astrue, 533 F.3d at 1040 (ALJ drew permissible

12  inference that plaintiff's pain was not all-disabling given that

13  plaintiff did not seek aggressive treatment program and responded

14  favorably to conservative treatment).

15      Here, contrary to plaintiff's assertion, the ALJ made note of

16  multiple reasons for declining to credit plaintiff's subjective

17  statements to the extent she claimed to suffer from limitations more

18  restrictive than those articulated in the RFC, including that:

19  •    the level of activity to which plaintiff admitted, including

20       performing chores around the house and helping to care for her

21       granddaughter, is inconsistent with the disabling limitations she

22       claims (see, e.g., TR 47-52);

23  •    plaintiff claimed she was prescribed a cane, (TR 146), though the

24       ALJ found that there was no evidence suggesting this was the case

25       within the medical record;

26  •    plaintiff noted that her medication helps her depression, and yet

27       testified, inconsistently, that she still has daily crying spells

28

1    (TR 40-41);

2   • plaintiff bolstered statements about her past psychiatric treatment

3     by stating she had been seeing psychiatrists at the Riverside

4     County Regional Medical Center since August 2005, whereas the

5     records from that facility contradict this and indicate plaintiff

6     was first seen at this facility in April 2007 (TR 49, 134, 278);

7   • plaintiff stated that she can walk for 15 to 20 minutes only if she

8     uses an inhaler, but, inconsistently, testified that she walks for

9     that amount of time for exercise (TR 50-52)[3];

10  • the medical evidence does not support the level of her complaints

11    of debilitating back pain or mental impairment (e.g., TR 216-21,

12    224-30, 243-50, 312-15);

13  • plaintiff claimed disabling depression, and yet admitted she felt

14    well enough not to seek any treatment for approximately nine months

15    prior to the hearing (TR 49-50);

16  • plaintiff asserted she suffers from side-effects from her

17    medication, and yet has taken many of her medications for many

18    years notwithstanding the fact that there are multiple alternatives

19    which could be used in the event the side effects become limiting

20    (e.g., TR 185-86.)

21  (TR 17-19.)

22    These findings are supported by the record and provide legally

23  sufficient reasons for the ALJ to decline to credit plaintiff's

24  subjective statements in their entirety. See, e.g., Carmickle v. Comm'r

25  of Social Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008).  Indeed, the

26  _____

27    [3]  She also indicated in a function report that when she
    goes out she travels either by driving or by walking.  (TR 143.)

28                                    10

court independently observes that plaintiff testified she was receiving unemployment compensation for one year starting in approximately July 2005, and that she was actively seeking work with child care at that time, which suggests plaintiff believed herself able to perform relatively vigorous work during the time she contends she was suffering from disabling impairments. (See TR 35.)

There is no material error here.

## CONCLUSION

Plaintiff clearly has severe impairments. However, a plaintiff who can still perform work in the national economy, even with a severe impairment, is not disabled as that term is defined by the Act. See generally Baxter v. Sullivan, 923 F.2d 1391, 1395 (9th Cir. 1991). Furthermore, if the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. Flaten v. Sec'y of Health and Human Servs., 44 F.3d at 1457.

After careful consideration of the record as a whole, the magistrate judge concludes that the Commissioner's decision is supported by substantial evidence and is free from material legal error. Accordingly, it is ordered that judgment be entered in favor of the Commissioner.

DATED: 11/24/09

_____
CAROLYN TURCHIN
UNITED STATES MAGISTRATE JUDGE

11

**SOCIAL SECURITY ADMINISTRATION**
**Office of Disability Adjudication and Review**

DECISION

| IN THE CASE OF | CLAIM FOR |
|---|---|
| | Period of Disability, Disability Insurance Benefits, and Supplemental Security Income |
| Gwendolyn A. McGowin | |
| (Claimant) | |
| | ████████ |
| (Wage Earner) | (Social Security Number) |

## JURISDICTION AND PROCEDURAL HISTORY

On February 2, 2007, the claimant filed a Title II application for a period of disability and disability insurance benefits. The claimant also filed a Title XVI application for supplemental security income on February 2, 2007. In both applications, the claimant alleged disability beginning August 1, 2005. These claims were denied initially on May 10, 2007, and upon reconsideration on July 19, 2007. Thereafter, the claimant filed a written request for hearing on August 15, 2007 (20 CFR 404.929 *et seq.* and 416.1429 *et seq.*). The claimant appeared and testified at a hearing held on September 25, 2008, in San Bernardino, California. Stephen M. Berry, an impartial vocational expert, also appeared at the hearing. The claimant is represented by Grace Osumi, an attorney.

At the hearing, by and through counsel, the claimant amended the dated of her alleged onset od disability to July 6, 2005.

## ISSUES

The issue is whether the claimant is disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

With respect to the claim for a period of disability and disability insurance benefits, there is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through December 31, 2010. Thus, the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

After careful consideration of all the evidence, I conclude the claimant has not been under a disability within the meaning of the Social Security Act from July 6, 2005 through the date of this decision.

**11**

See Next Page



## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a) and 416.920(a)).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, I must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b) and 416.920(b)).  Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a) and 416.972(a)).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b) and 416.972(b)).  Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in SGA (20 CFR 404.1574, 404.1575, 416.974, and 416.975).  If an individual engages in SGA, she is not disabled regardless of how severe her physical or mental impairments are and regardless of her age, education, and work experience.  If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, I must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c) and 416.920(c)).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1521 and 416.921; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p).  If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled.  If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, I must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the duration requirement (20 CFR 404.1509 and 416.909), the claimant is disabled.  If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, I must first determine the claimant's residual functional capacity (20 CFR 404.1520(e) and 416.920(e)).  An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  In making this finding, I must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p).

**12**

Gwendolyn A. McGowin                                   Page 3 of 12

Next, I must determine at step four whether the claimant has the residual functional capacity to perform the requirements of her past relevant work (20 CFR 404.1520(f) and 416.920(f)).  The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b), 404.1565, 416.960(b), and 416.965).  If the claimant has the residual functional capacity to do her past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g) and 416.920(g)), I must determine whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, she is not disabled.  If the claimant is not able to do other work and meets the duration requirement, she is disabled.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.  In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512(g), 404.1560(c), 416.912(g) and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, I make the following findings:

1.   **The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.**

2.   **The claimant has not engaged in substantial gainful activity since July 6, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**

The claimant worked after the established disability onset date but this work activity did not rise to the level of substantial gainful activity. The claimant had reported earnings in the amount of $238 in 2006 (Exhibit 1D, p.2).  She also testified she actively sought child care work since her alleged onset date.  Nevertheless, there is no evidence of record to suggest these activities rose to the threshold of substantial gainful activity.

3.   **The claimant has the following severe impairments: status post heart attack, musculoligamtous sprain, cervical  spine; musculoligamtous sprain, thoracic spine; musculoligamtous sprain, lumbar spine; and depression (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).**

Medical records reveal that the claimant's severe impairments identified above cause more than a minimal effect on her ability to perform basic work activities (Exhibits 1F-14F).

**13**

See Next Page

Gwendolyn A. McGowin █████████                                    Page 4 of 12

The claimant asserted at the hearing that she was recently diagnosed with fibromyalgia and, in fact, a medical record dated August 27, 2008, less than a month before the hearing gives such a diagnosis from Roger Garrison, D.O. (Exhibit 11F, p.2).  On the same day, L. Hashenri[1] (not a medical doctor) added fibromyalgia to an off-work order given to the claimant (Exhibit 14F, p.1).  However, the treatment records fail to support such a finding.  There is no evidence the claimant has multiple trigger points throughout the cervical, thoracic, and lumbar paraspinals or elsewhere, and Dr. Garrison's examination mentions no neurological deficits, motor, reflex, or sensory testing.  *Id.*  The medical evidence of record fails to support a finding that that fibromyalgia is a medically determinable impairment.

It should be noted that most people complaining of fibromyalgia, even those who are properly and accurately diagnosed, are not totally disabled from working (*Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) and (*Preston v. Secretary of Health and Human Services*, 854 F.2d 815, 818 (6th Cir. 1988)).

**4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).**

Although the claimant has the severe impairments listed above, her impairments or combination of impairments, do not meet or equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4.  This finding is supported by the opinion of the State Agency physicians, all of whom considered the relevant Listings.

The claimant's mental impairment does not meet or medically equal the criteria of listing 12.04. In making this finding, I have considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  A marked limitation means more than moderate but less than extreme.  Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

The claimant has mild restriction in activities of daily living, mild difficulties in social functioning, mild to moderate difficulties with regard to concentration, persistence or pace, and the claimant has experienced no episodes of decompensation, which have been of extended duration.  Because the claimant's mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

I have also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria.  Following her heart attack on July 7,

---

[1] The correct spelling of this individual's name is uncertain due to his/her handwriting.  However, it is evident this person is not a medical doctor, as they clearly crossed out "M.D." after their name (Exhibit 14F, p.1).

See Next Page

**14**

2005, the claimant was diagnosed with a major depressive disorder, recurrent, severe, without psychotic features on August 19, 2005, at which time she was prescribed Zoloft and referred to group therapy (Exhibit 1F, pp.7-9). Nevertheless, there is no evidence, nor has the claimant alleged that she has had repeated episodes of decompensation, each of an extended duration; or that the claimant has a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause her to decompensate; or that she has a current history of one or more years inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. Therefore, in this case, the evidence fails to establish the presence of the "paragraph C" criteria.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

**5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is limited to sitting one hour at a time, five or six hours in an eight-hour workday. She can stand three hours in an eight-hour workday for 30 minutes at a time and should be allowed to reposition each hour for one to three minutes. The claimant should be allowed to lie down during her lunch break. The claimant can occasionally climb stairs or ramps, balance, stoop, kneel, crouch, and crawl and she is precluded from climbing ropes, ladders or scaffolds.   The claimant is able to perform moderately complex tasks.**

In making this finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. I have also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. For this purpose, whenever

**15**

Gwendolyn A. McGowin ███████████                                    Page 6 of 12

statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must make a finding on the credibility of the statements based on a consideration of the entire case record.

Upon application, the claimant cited heart disease with chronic chest pain, lower back problem, high blood pressure, high cholesterol, depression and anxiety as the conditions preventing her from sustaining substantial gainful activity. She reported she was too depressed, weak and tired to work. The claimant said she stopped working on July 7, 2005 because she was in an automobile accident (Exhibit 2E, p.2). At reconsideration, the claimant denied any changes in her condition; however, she maintained she still got pain in her arm, tightness in her chest, and said the blood did not flow through her body as it should and as a result it hurt her arm and made her legs feel heavy (Exhibit 7E, pp.1,5). She also said she was unable to sit too long. In addition, the claimant stated she was very depressed and totally un-motivated. *Id. at 5.* When the claimant filed her request for hearing, she again denied any change in her condition, but said she still had pain in her leg and shortness of breath which she attributed to stress (Exhibit 9E, pp.1, 5). She said she did not function, was very forgetful, could not stand for long, had pains that ran up her leg, and was depressed all the time. *Id. at 5.* The claimant also alleged that side-effects of (unspecified) medications made her tired, confused and heavy feeling. *Id. at 6.*

During the hearing, the claimant testified she last worked as a sales clerk on July 6, 2005 when she had a heart attack. She said she was given two stents after the heart attack and acknowledged she worked one day in January 2006. However, she said she had an automobile accident in January 2006 that resulted in a bulge in a disc in her neck. The claimant said she has pain in her legs and arms; alleged her legs are heavy; that she has shortness of breath, uses an inhaler; has heaviness in her chest; and is depressed a lot. In response to direct and leading questions by her representative, the claimant responded that her medications slow her down all day. The claimant described the accident she had in January 2006 in which she allegedly sustained neck and back injuries. The claimant said she takes Tylenol for her back, and Soma occasionally. She again alleged having side-effects from her medications. The claimant rationalized she could sit an hour at a time up to three hours and stand two hours. She asserted she would be lying down the remainder of the time. In response to my questions, the claimant said she can walk 15 to 20 minutes with an inhaler, then has to rest before she can resume walking for another 15 minutes. However, she also admitted she walks for exercise 15 to 20 minutes at a time. And the claimant is able to lift a gallon of milk.

Regarding her mental health, in response to her representative, the claimant stated she is getting mental health treatment now and takes Lexapro. However, she claimed Lexapro slows her down and complained that she was still depressed on Lexapro. She declared she has crying spells three or four times a day which last one hour. The claimant described having seen a psychiatrist one to two times a month for six months and said she was in group therapy following her heart attack. Nonetheless, she admitted she had not seen anyone since January 2008, but then claimed she just returned to mental health treatment (September 2008).

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these

**16**

See Next Page

symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

Following her myocardial infarction and stent placement to two vessels in July 2005, the claimant was reported to have a history of coronary artery disease (CAD) as well as hypertension which is generally well-controlled with medication (Exhibits 2F, p.3; 7F, p.2-5, 7; 11F, p.8, 12). On January 4, 2007, she complained she had atypical chest pain for several months, and numbness in her left arm and leg. *Id. at 6-7.* A subsequent electrocardiogram (EKG) to evaluate for coronary artery disease found normal left ventricular dimensions and systolic function. No significant valvular pathology was seen. The estimated pulmonary artery systolic pressure was within normal limits. *Id. at 23.* Clinic notes from Riverside County Regional Medical Center, dated February 28, 2007, stated the claimant had an adenosine stress test and myocardial perfusion study, which were unremarkable. *Id. at 5.* These stated she had an ejection fraction of 70%, normal pulmonary artery systolic pressure, and normal left ventricular systolic function. There was no wall motion abnormality. She still reported frequent episodes of chest discomfort, even without exertion. The claimant was noted to be taking Fluoxetine for a history of depression. *Id.*

The claimant had a complete evaluation by a Board eligible internist on April 19, 2007, who described a well-nourished female in no acute physical distress (Exhibit 2F, p.3). The doctor said the claimant got into and out of her chair without difficulty and there was no apparent ataxia or dyspnea noted. Her blood pressure (120/80) and pulse rate (64) were within normal limits. *Id.* An examination of the claimant's cardiovascular system fond no heaves or thrills; there was regular S1 and S2; and he could not appreciate a murmur or S3. *Id. at 4.*

On February 27, 2008, the claimant reported having chronic chest pain which was thought to be from chronic stable angina; however, the doctor noted she complained of being under a lot of stress (Exhibit 11F, p.12). His physical examination of her cardiovascular system revealed a regular rate and rhythm without murmur. *Id.* On March 12, 2008, she had a borderline EKG after complaining about heaviness in her chest. She said she was off all medications for two days and could not afford any medication. *Id. at 9-10.* The physical examination was again normal. *Id.* The doctor determined the claimant's chest pain was stress related. *Id. at 8.* Dr. Garrison, the attending internist described the claimant's CAD as stable on August 28, 2008. *Id. at 2.*

The claimant also has complained of back/neck pain as the result of an automobile accident in January 2006. Related to the accident, she underwent an orthopedic consultation on April 25, 2006 by a Qualified Medical Examiner, mark Greenspan, M.D., a Board certified orthopedic surgeon (Exhibit 13F, pp. 1-6). An X-ray of the claimant's cervical spine revealed a small spur off the anterior inferior body of C5. *Id. at 5.* An X-ray of her lumbar spine revealed a slight narrowing of the L5-S1 interspace. There was calcification anterior to the lumbar spine. The doctor's objective findings were as follows:
   1. Paravertebral and upper trapezii muscles were tender with spasm.
   2. Right and left lateral flexion of the cervical spine were performed with slight pain and spasm.
   3. Abduction and forward flexion of both shoulders were restricted by 20 degrees.

**17**

Gwendolyn A. McGowin ██████████                                    Page 8 of 12

4. Slight tenderness and spasm in the lumbar spine.
5. Sacroiliac joints were tender bilaterally.
6. Right sciatic notch was tender.
7. Toe walking, heel walking, hopping and squatting caused increased low back pain.
8. Extension and left lateral bending of the lumbar spine were performed with slight pain.
9. Right and left rotation of the lumbar spine were performed with slight pain and spasm.
The doctor concluded the claimant had musculoligamtous sprain, cervical spine;
musculoligamtous sprain, thoracic spine; and musculoligamtous sprain lumbar spine. *Id.*

At the request of her chiropractor, Dr. Brown, the claimant had X-rays taken on July 3, 2006 that
confirmed a 2 mm posterior bulging of the disc at the L4-L5 disc space level (Exhibit 12F, p.5).
The spinal canal and neural foramina were normal in size.  At the L5-S1 disc space level, there
was 2mm posterior bulging of the disc. There was a mild spinal canal stenosis, probably due in
part on a congenital basis. Finally, there was a mild bilateral foraminal stenosis without nerve
root compression. *Id.* After examining the claimant, a conservative course of treatment was
prescribed.  As her symptoms improved, the claimant was instructed in various rehabilitative
exercises that were to be performed daily at home. *Id.*  The claimant reported significant
improvement in her symptoms. *Id. at 6.*

The claimant had the internal medicine consultative examination on April 19, 2007 (Exhibit 2F,
pp.1-8).  During it, the claimant complained of low back pain since she was involved the motor
vehicle accident in January 2006.  She appeared to be in no acute distress, denied needing
assistive devices to ambulate, reported her pain did not radiate, and said she took pain
medication as needed. The examination of the claimant's back revealed no tenderness to
palpitation; her straight leg raising was negative to 60°; forward flexion was 70/90°, and the
remainder of range of motion was normal. The claimant's range of motion of her extremities was
within normal limits; her neurological motor, sensory and reflexes were intact; and her gait was
normal. *Id. at 4-5.*

In making a determination as to the claimant's physical limitations, great weight is given to the
opinion of the consultative examiner, Dr. Lin, who, on April 19, 2007, found the claimant
capable of lifting and/or carrying 50 pounds occasionally and 25 pounds frequently (Exhibit 2F,
p.5). He said she could stand or walk for 6 hours in an 8-hour workday with appropriate breaks,
and sit for 6 hours in an 8-hour workday with frequent bending, stooping, kneeling, crouching,
and climbing stairs. His conclusions and opinions were affirmed on initial review and
reconsideration by the Board certified State agency review physicians, thereby making them
more persuasive (Exhibits 5F, 6F, 9F, and 10F).

I have read and considered the opinion of the non-acceptable medical source, namely the
unidentified L. Hashenri, and give it little weight (Exhibits 14F, p.1).  Without adequate
explanation or objective evidence, he/she gave the claimant an off-work order for 50 weeks on
August 27, 2008. *Id.*

The claimant has scant medical evidence to support her complaints of debilitating back pain.
After the orthopedic consultation requested by Dr. Brown, the claimant's chiropractor, the doctor
said the claimant reported significant improvement of her symptoms on July 3, 2006, and he did

**18**

See Next Page

not impose limitations relating to her back on her ability to work.  There are subsequent medical records in evidence up through August 28, 2008; yet, there is no evidence of musculoskeletal complaints or limitations.  In a function report, she did claim she wore a back brace and occasionally used a cane, but there is no evidence these were prescribed, recommended or medically necessary (Exhibit 3E, p.7).  Nevertheless, I have given generous consideration to the claimant's subjective complaints of chest pain, and heaviness as well as back pain and have further limited her work activities to light as described in the residual functional capacity assessment above.  The claimant has medically determinable impairments that could reasonably cause some pain and dysfunction.  However, the complaints of a disabling level of pain are not credible and are not reasonably supported by objective medical evidence, especially when consideration is given to the idiosyncratic nature of pain (SSR 96-7p).

Regarding her mental impairment, the claimant commenced mental health treatment for depression on August 19, 2005 following her heart attack (Exhibit 1F, pp.7-9).  At the initial assessment, Dr. Saleeb diagnosed her with a major depressive disorder, recurrent, without psychotic features secondary to her medical condition. *Id. at 9.*  The claimant commenced group therapy on August 20, 2005 and she continued until January 2006 when she left because she felt better and wanted to try it on her own (Exhibit 8F, p.10).  On January 13, 2006, Dr. Saleeb reported the claimant could return to work "today" without restrictions (Exhibit 1F, p.21).

However, the claimant returned for treatment on April 3, 2007, at which time she was diagnosed with a major depressive disorder, single episode, moderate (Exhibit 8F, p.9).  She complained she was depressed, had insomnia, had difficulty concentrating, was fatigued and said she was anxious and that exacerbated her chest pain. *Id. at 10.*  She reported she was living with her daughter and made it known she had applied for Social Security disability benefits. *Id. at 11.*  The claimant was described as very cooperative.  Her mood was depressed and tearful; otherwise, she showed good judgment and insight; her thought processes were normal; she was not delusional; and she denied having hallucinations. *Id. at 13.*

On April 29, 2007, the claimant had a complete psychiatric examination by a Board certified psychiatrist, Dr. Parikh (Exhibit 3F).  The findings showed the claimant was able to go places alone as she drove herself to the appointment.  She complained of depression secondary to a myocardial infarction in January[2].  The claimant asserted she had been seeing Dr. Purmandla since August 2005, although Dr. Purmandla's report shows the claimant was first seen at his facility on April 3, 2007 (Exhibit 8F, p.2).  She also said she was taking Prozac (Exhibit 3F, p.2). The claimant complained she had low motivation, occasional feelings of hopelessness, and hypomania, but denied symptoms of mania, hallucinations, or obsessive compulsive symptomology.  He diagnosed her with a mood disorder secondary to her medical condition, but said her global assessment of functioning score (GAF) score was 70, indicative of some difficulty in social, occupational, or school functioning but generally functioning pretty well, has some meaningful interpersonal relationships[3].

---

[2] Note the claimant's assertion that she had a second heart attack in January 2007 is unsubstantiated in the record.
[3] Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV), p.32

**19**

See Next Page

Gwendolyn A. McGowin (▬▬▬▬▬▬)                                    Page 10 of 12

On May 1, 2007 Dr. Purmandla met with the claimant and other than noting she was depressed, found her appearance, behavior, level of consciousness, concentration, affect, thought processes, content and perceptions were all normal, appropriate, or good (Exhibit 8F, p.8).

Following this report, on May 7, 2007, a Board certified State agency review psychiatrist reviewed the claimant's mental health records and concluded the claimant did not have a severe mental impairment (Exhibit 6F, p.3). While I give substantial weight to this finding, which was affirmed on July 16, 2007 at reconsideration, I give greater weight to the earlier findings of Dr. Parikh when he found, from a psychiatric standpoint, the claimant did not have any impairment in the ability to reason and make social, occupational, and personal adjustments (Exhibit 3F, p.6). The doctor's assessment was that from a psychiatric standpoint, the claimant did not have any impairment in the ability to reason and make social, occupational, and personal adjustments. There were no mental restrictions in the claimant's daily activities, no mental difficulties in maintaining social functioning, and her concentration, persistence, and pace were not impaired. The claimant had no repeated episodes of emotional deterioration in work-like situations. The claimant's ability to understand, carryout, and remember simple or complex instructions was not impaired; her ability to understand, carryout, and remember complex instructions was not impaired; her response to coworkers, supervisors, and the general public was not impaired; her ability to respond appropriately to usual work situations was not impaired; and her ability to deal with changes in a routine work setting was not impaired. *Id.* Dr. Parikh is not only a Board certified psychiatrist who had an opportunity to examine the claimant, he is well-versed in Social Security laws and regulations as they pertain to disability and I find his conclusions sound and persuasive.

On the other hand, the evidence shows Dr. Purmandla met with the claimant twice before completing a "narrative report" on June 18, 2007 (Exhibit 8F, p.2). I give less weight to this report because it appears to contain inconsistencies, and the doctor's opinion is accordingly rendered less persuasive. The doctor reported the claimant could sustain repetitive tasks for an extended period, but alleged the claimant would be unable to maintain a sustained level of concentration and would be unable to complete a 40 hour workweek without decompensating. *Id.* And, in the notes from his meeting with the claimant on May 1, 2007, prior to completing this form, he said she was alert, her concentration was good, she was oriented x4, her memory was intact and he gave her a GAF score only of 55, indicative of moderate difficulty in social, occupational or school functioning[4]. *Id. at 5-6.* Lastly, I fail to find evidence that Dr. Purmandla's association with the claimant had been more than two visits and therefore it is given no more weight than Dr. Parikh's who also examined the claimant.

The testimony of the claimant and the statements from her niece in the E Section credibly establish no different conclusions (Exhibits 3E and 4E). These statements in the record describing her daily activities indicate the claimant was independent for all self-care activities, performed a variety of daily activities, interacted with others on a superficial basis, engaged in purposeful activity, and cared for her granddaughter. She prepares food, shops, and drives. *Id.* At the hearing she testified she walks upstairs to her room, does chores, picks up, and watches her granddaughter after school, occasionally driving to get her. I find that while the statements of the claimant at the hearing and contained in the evidence are credible to the extent that the

---

[4] *Id.*

claimant is limited to performing work within the delineated residual functional capacity, all the aforementioned factors are inconsistent with an incapacitating or debilitating condition at any time since the claimant's alleged onset date.

Finally, the claimant also asserted she suffers from side effects from medication treatment resulting in fatigue and concentration problems. However, I find these are not substantiated in the medical record or report. Instead, these symptoms are more indicative of the claimant's situational depression secondary to her medical problems. Even so, she reported these medications have been prescribed and taken for years, which raised inferences of efficacy and toleration. There are multiple medications in the analgesic and /or anti-depressive armamentarium which could be used should these ever prove ineffective or possessive of untoward side effects.

All the aforementioned factors are inconsistent with an incapacitating or debilitating condition at any time since the claimant's alleged onset date. As such, I cannot find that the claimant's statements are sufficiently credible to warrant the establishment of more restrictive limitations. Rather, I reiterate the determination that the claimant remains mentally and physically capable of performing work activity as indicated above.

**6.    The claimant is capable of performing past relevant work as a reservations agent. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).**

The claimant worked as a reservations clerk from May 1995 through September 2003 (Exhibit 2E, p.3). The claimant's earnings record between 1996 and 2003 reflect earnings in excess of the minimum threshold for substantial gainful activity (Exhibit 1D, p.2).

In comparing the claimant's residual functional capacity with the physical and mental demands of this work, I find that the claimant is able to perform it as actually and generally performed. The vocational expert, Mr. Berry, described the claimant's past relevant work as skilled work (SVP 5), performed at the sedentary level as the claimant described it, and as it is generally performed (Exhibit 14E, p.1). He said this work would have provided the claimant with clerical, computer, customer service, and receptionist skills, and noted there are 3,000 such jobs in the regional economy and over 40,000 nationally.

**7.    The claimant has not been under a disability, as defined in the Social Security Act, from July 6, 2005 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).**

<u>DECISION</u>

Based on the application for a period of disability and disability insurance benefits filed on February 2, 2007, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

**21**

See Next Page

Gwendolyn A. McGowin ███████████                    Page 12 of 12

Based on the application for supplemental security income filed on February 2, 2007, the
claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

/s/ *Mason D. Harrell, Jr.*
Mason D. Harrell, Jr.
Administrative Law Judge

November 19, 2008
Date

mkg

**22**